UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BERNARD HOWARD, individually;

       Plaintiffs,

                             No.

-v-                           Hon.

DALE COLLINS, in his individual
capacity; WILLIAM RICE, in his individual
capacity; REGINALD HARVEL, in his individual
capacity; STEVEN MYLES, in his individual
capacity; and MONICA CHILDS, in her
individual capacity;

       Defendants.

_____

## **COMPLAINT AND JURY DEMAND**

NOW COMES the Plaintiff, BERNARD HOWARD, individually, by and through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and files his Complaint against the Defendants in this civil action, stating unto this Court as follows:

1.     This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, against Defendants, DALE COLLINS, in his individual capacity; WILLIAM RICE, in his individual capacity; REGINALD HARVEL, in his individual capacity; STEVEN MYLES, in his individual capacity; and MONICA

CHILDS, in her individual capacity.

2.       Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3.       Forum is proper based on the situs of the incident, which occurred in the CITY OF DETROIT.

4.       At all pertinent times, Plaintiff, BERNARD HOWARD, was a United States citizen.

5.       At all pertinent times, Defendant, DALE COLLINS ("COLLINS"), was employed as a Sergeant by the Detroit Police Department ("DPD") and was acting under color of law.

6.       At all pertinent times, Defendant, WILLIAM RICE ("RICE"), was employed as a Lieutenant by the Detroit Police Department ("DPD") and was acting under color of law.

7.       At all pertinent times, Defendant, REGINALD HARVEL ("HARVEL"), was employed as a Sergeant by the Detroit Police Department ("DPD") and was acting under color of law.

8.       At all pertinent times, Defendant, STEVEN MYLES ("MYLES"), was employed as a police officer by the Detroit Police Department ("DPD") and was acting under color of law.

9.       At all pertinent times, Defendant, MONICA CHILDS ("CHILDS"), was employed as a Sergeant by the Detroit Police Department ("DPD") and was

acting under color of law.

10.     The individual Defendants, as sworn police officers, had each taken

an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part:  *"As a*

*sworn police officer, my fundamental duty is to serve the community; to safeguard*

*lives and property; to protect the innocent against deception, the weak against*

*oppression or intimidation and the peaceful against violence or disorder; and to*

*respect the constitutional rights of all to liberty, equality and justice."*

## <u>GENERAL ALLEGATIONS</u>

11.     On July 16, 1994, Marcus Averitte, Reshay Winston, and John

Thornton were murdered on Detroit's east side in a drug-related shooting.

12.     Witnesses placed Kenneth McMullen, Ladon Salisbury, and a third

unidentified person at the scene of the crime near the time of the shootings.

McMullen and Salisbury were later arrested.

13.     Plaintiff was brought in for questioning when his nickname, "Snoop

Dog," came up in the investigation and he had known Kenneth McMullen.

14.     On July 17, Plaintiff went to police headquarters and gave a

statement.  He was then released.

15.     On July 18, Kenneth McMullen was arrested and brought to the

Homicide Section at approximately 8:00 a.m.  There, he was interrogated on the 5th

floor at 1300 Beaubien St. for the remainder of the day until approximately 1:30

3

a.m. on July 19.

16.     Plaintiff was taken from the 9th floor lockup back down to the 5th floor Homicide Section at approximately 8:30 a.m., on July 19.  Defendant, Steven Myles, was the principal interrogator of Ken McMullen during the July 19 interrogation.  After 24 hours of little sleep, no food, and just being offered soda to drink, Myles made the following promise: a) McMullen could stay silent and go to prison for the rest of his life; b) blame Salisbury and Plaintiff and just admit to participating in the robbery and McMullen would spend 15 months in Wayne County Jail; or c) sign Myles' pre-typed statement admitting to participating in the murder with Howard and Salisbury and be allowed to go home.

17.     Myles' promises were completely illusory, as he had neither the intent nor authority to make any such "deals" with McMullen.  Myles knew that if McMullen signed the statement, he would be charged with three counts of first-degree murder.

18.     McMullen chose the option allowing him to go home and admitted to the facts contained in Myles' pre-typed statement, claiming that Howard, Salisbury, and himself committed the murders and robbery.

19.     On July 17, 1994, at 12:45 p.m., serial jailhouse snitch witness, Oliver Cowan, gave a statement indicating that Kenneth McMullen voluntarily told Cowan about the murders and confessed to his involvement, while also implicating

4

Ladon Salisbury and Plaintiff.

20.    On July 17, 1994, at 1:15 p.m., serial jailhouse snitch witness, Joe Twilley, gave a statement indicating that Kenneth McMullen voluntarily told Twilley about the murders and confessed to his involvement, while also implicating Ladon Salisbury and Plaintiff.

21.    Plaintiff voluntarily returned to DPD Headquarters on July 19. Homicide detectives on the 5th floor of 1300 Beaubien interrogated him for hours while Plaintiff denied any involvement in the crime.

22.    On July 20, 1994, after enduring several hours of threats from Detroit Police Department detectives, another detective, Monica Childs, began to interrogate Plaintiff.  Playing the classic "bad cop/good cop" routine (likely learned at the now-debunked Reid School of Interrogation), Childs interrogated Plaintiff for several more hours.  Childs, the "good cop" part of the routine, promised Plaintiff if he signed a pre-typed statement she had prepared, he would be free to go home with his mother, who Childs said was waiting outside.

23.    Childs knew that her promise was illusory, as Plaintiff's mother was not outside the office.  Childs also knew that Plaintiff would be arrested and charged with a triple homicide if he signed the statement.

24.    Plaintiff, having been awake for 24 hours, was functionally illiterate at age 18.  After approximately 12 hours of interrogation, he signed the pre-typed

statement he was unable to read.  It was a confession to a crime he did not commit.

25.     The "confession," which Plaintiff did not write and could not read or understand, was filled with details Childs had gleaned from reading the police file and speaking with detectives.  The facts in the statement were facts that only the police knew, so it could be spun that Plaintiff provided details that only someone present at the murder scene would know.

26.     Plaintiff was immediately arrested after signing the statement.

27.     While detained in the 9th floor lockup at 1300 Beaubien, Plaintiff had a brief encounter with Joe Twilley, another inmate.  They had a fleeting conversation in which Twilley told Plaintiff the police were setting him up to take the blame for the murders.

28.     To Plaintiff's surprise, Twilley would later testify at Plaintiff's Preliminary Exam and trial that Plaintiff's co-defendants, Kenneth McMullen and Ladon Lavell Salisbury (nicknamed "Vell"), had confessed to the murders and had implicated Plaintiff as the third man involved in the murders.

29.     On July 20, 1994, following Plaintiff's "confession," Defendant, Harvel, filed his Investigator's Report/Request for Warrant with the Wayne County Prosecutor's Office.

30.     Harvel's Investigator's Report falsely stated that Plaintiff had confessed to participating in the murders and omitted the fact that Plaintiff's

alleged confession obtained from Defendant, CHILDS, was fabricated by her; otherwise, no ethical prosecutor would have authorized the warrant.

31.     Harvel's report omitted the critical point that Plaintiff was only implicated in the murders because of the DPD snitch witness program that used felons as agents and listening posts for the police and that Joe Twilley and Oliver Cowan fabricated statements implicating McMullen, Salisbury, and Plaintiff in the murders.

32.     The arrest warrants were recommended by Assistant Prosecutor John Scavone.

33.     Harvel, acting in accordance with Michigan law, presumably swore to facts supporting probable cause before a 36th District Court Judge who signed the arrest warrant.

34.     Harvel's sworn testimony omitted the facts surrounding the tainted statements from serial jailhouse snitch, Joe Twilley, and the fact that Plaintiff's alleged confession obtained from Defendant, Childs, was fabricated by her; otherwise, no reasonable judge would have authorized the warrant.

35.     At the time police were interrogating Plaintiff, they already knew that a witness identified another suspect, who went by the nickname "Snoop Dog" and was 5'6, 140-145 lbs., who had dated Rashay Winston and had threatened her and Averitte, with whom Winston was living at the time.

36.    There was no physical evidence or eyewitnesses linking Plaintiff to the crime.

37.    On July 22, 1994, at 12:30 a.m., serial jailhouse snitch witness, Joe Twilley, gave a statement indicating that Ladon "Vell" Salisbury voluntarily told Twilley about the murders and confessed to his involvement, while also implicating Ladon Salisbury and Plaintiff.

38.    The Preliminary Exam was held on August 16, 1994. Twilley, whose prison sentence for second-degree murder had been reduced to time served in a secret hearing two weeks earlier, testified to the false "confessions" made by McMullen that implicated Plaintiff in the murder.

39.    Defendant, Childs, also testified to the coerced and fabricated confession Plaintiff allegedly made on July 20.

40.    Based on the fabricated evidence, Plaintiff was bound over for trial with McMullen and Salisbury.

41.    Defendants never disclosed to the prosecutor before the Preliminary Exam that Plaintiff's alleged confession was fabricated or that Joe Twilley had testified or otherwise assisted in procuring "confessions" from suspects in at least twenty cases before testifying at Plaintiff's Preliminary Exam.

42.    Childs intentionally and deliberately did not disclose to the prosecutor at any time before or during trial that Plaintiff's alleged confession was fabricated

by her and that she used objectively coercive tactics to procure Plaintiff's signature.

43.     Harvel, the OIC, intentionally and deliberately did not disclose to the prosecutor at any time before or during trial that Joe Twilley had testified or otherwise assisted in procuring "confessions" from suspects in at least twenty cases before testifying at Plaintiff's Preliminary Exam.

44.     The evidence withheld from the prosecutor would have been apparent to any reasonable officer as being material exculpatory or impeachment ("*Brady*") evidence that must be turned over to the prosecutor.

45.     Had Childs and Harvel told the prosecutor before trial the evidence set forth above, the prosecutor would have had a constitutional "*Brady*" obligation to provide that evidence to the defense, as it clearly impeached the credibility of Joe Twilley, destroyed probable cause, and impugned the integrity of the entire murder investigation.

46.     But for the fabricated and coerced statements of Ladon Salisbury and Kenneth McMullen, and the fabricated and coerced "confession" elicited by Defendant, Childs, probable cause for an arrest and continued detention would not have existed.

47.     Knowledge of the *Brady* evidence and fabricated confession would have resulted in no warrant being approved by the prosecutor's office.

48.     On March 30, 1995, based on Sgt. Monica Childs's fabricated "confession" and the fabricated statement of notorious jailhouse snitch Joe Twilley, a Recorder's Court jury convicted Plaintiff of three counts of felony murder, three counts of armed robbery, and one count of felony firearm in the deaths of Marcus Averitte, Reshay Winston, and John Thornton.

49.     On May 12, 1995, Bernard Howard was given three life sentences without the possibility of parole in addition to sentences for armed robbery and felony firearm. *Id.*

50.     Following years of unsuccessful appeals, Plaintiff was able to have his case reviewed by the Wayne County Conviction Integrity Unit ("CIU").  In February 2020, the CIU had exonerated Ramon Ward, who served 25 years in prison following his 1994 murder conviction.  Ward's conviction was procured by the same fabricated evidence involving the same jailhouse snitch, Joe Twilley, and a false confession procured by detective Monica Childs.

51.     During the Ramon Ward investigation, news articles were written by investigative journalist Ryan Felton detailing the DPD Homicide Section's notorious snitch witness program.[1]  Felton reported that two weeks before he

---

[1]   https://jalopnik.com/the-would-be-auto-worker-caught-up-in-a-detroit-prison-1794192411; https://m.metrotimes.com/detroit/how-detroit-police-allegedly-used-a-ring-of-jailhouse-informants-in-the-1990s-to-wrongly-implicate-dozens/Content?oid=3695836&storyPage=2

testified at Plaintiff's Preliminary exam, Joe Twilley had his second-degree murder sentence reduced to time served at the request of DPD Homicide detectives, Collins and Rice.  A transcript of a then-secret hearing on July 27, 1994, in the judge's chambers, reveals that DPD Homicide Detective Dale Collins testified under oath that Joe Twilley *"has assisted the Detroit Police Department Homicide Section on a number of homicides in the City of Detroit.  And he has always cooperated in basically anything that we wanted him to do."*  When asked by Judge M. John Shamo how many homicide cases Twilley had assisted on, Sgt. Collins replied, *"I'd say at least twenty."*  Collins reported that Twilley also had assisted other police agencies in gaining convictions.

52.     On the basis of his cooperation as a jailhouse snitch witness and the homicide detectives' fear for Twilley's safety (because he was a prolific snitch), Judge Shamo reduced Twilley's second-degree murder sentence to time served.

53.     Newly-discovered evidence from Plaintiff and the CIU investigation that was not presented at Plaintiff's trial included the sordid history of the DPD jailhouse snitch program that had existed unfettered throughout the 1990s and into the 2000s.  This evidence was never provided to defense counsel, in violation of *Brady v Maryland,* 373 U.S. 83 (1963).

54.     Plaintiff's fabricated "confession" and the alleged statements by Kenneth McMullen and "Val" to Joe Twilley clearly affected the decision of the

11

jury, as it returned with a conviction.

55.    On March 30, 1995, Plaintiff was convicted of three counts of felony murder, three counts of armed robbery, and felony firearm.

56.    On May 12, 1995, Plaintiff was sentenced to three life sentences without the possibility of parole and two years for felony firearm.

57.    But for Defendants' conduct, as set forth below, there would have been no probable cause for Plaintiff to be charged with any crimes.

58.    In 2020, the Wayne County Prosecutor's Office's Conviction Integrity Unit ("CIU"), led by Valerie Newman, conducted an independent investigation into the Bernard Howard case.

59.    The CIU investigation revealed that Plaintiff's alleged confession was false and, in fact, fabricated by Childs.  The CIU investigation also concluded that Plaintiff was not involved in the murders for which he was convicted.

60.    On December 17, 2020, based on the newly-discovered evidence, the Wayne County Prosecutor's Office stipulated to an Order vacating Plaintiff's conviction dismissing criminal charges.

61.    **Plaintiff's wrongful incarceration in jail and prison, from July 20, 1994, to December 17, 2020, totaled 9,648 days, or 26 years, 4 months, and 28 days.**

62.    Due to the misconduct of Defendants, as set forth below, Plaintiff,

BERNARD HOWARD, suffered the following injuries and damages:

    a.    Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 26 years, including significant time spent in solitary confinement;

    b.    Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged and convicted of three counts of first-degree murder and felony-firearm and facing life in prison without the possibility of parole; a real-life death sentence;

    c.    Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d.    Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

    e.    Loss of enjoyment of daily activities including, but not limited to, seeing his children grow into adults;

    f.    Not being able to attend the funerals of family members, including his beloved mother, his stepfather, three cousins, two aunts, and an uncle;

    g.    Physical injuries suffered in prison;

    h.    Loss of employment opportunity, past income and future earning capacity;

    i.    Loss of his close relationship with his minor children;

    j.    Physical injuries while being imprisoned, including being assaulted;

    k.    Loss of employment opportunity, past income and future earning capacity;

    l.    Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

    m.    Many of Plaintiff's injuries and damages are likely to be permanent;

    n.    Other damages which may be revealed through discovery.

63.    Due to the conduct of Defendants, as set forth below, the true killers have never been caught and the victim's family has never received true closure.

## COUNT I

### *"BRADY"* VIOLATIONS BY DEFENDANTS HARVEL, COLLINS, MYLES, AND RICE

64.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

65.    At all times, Plaintiff had a constitutional right of due process, guaranteed by the 14th Amendment, to be free from police officers not disclosing to the prosecutor material exculpatory and/or impeachment evidence.

66.    Defendants, HARVEL, COLLINS, MYLES, and RICE, knowingly violated their unwavering legal duty (*"Brady"* duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, by intentionally and deliberately choosing not to tell the prosecutor the following:

14

a.    That the witness, Joe Twilley, had been used as a listening post and agent for homicide detectives in more than twenty previous cases and was acting as an agent for HARVEL in the instant murder case;

b.    That the DPD Homicide Section had used jailhouse informants (snitch witnesses) as agents and listening posts for years to help secure convictions;

c.    That Defendant, CHILDS, had manufactured Defendant's false confession and obtained Plaintiff's false "confession" by false promises, including that he could go home with his mother if he signed the pre-typed statement. This undisclosed fact would have been exculpatory evidence and impeached Childs and the state's primary theory; and

d.    That Defendant, MYLES, had secured an involuntary "confession" from Kenneth McMullen by coercive tactics and illusory promises which implicated Plaintiff in the triple homicide and provided probable cause for his arrest. This undisclosed fact would have been exculpatory evidence and impeached Childs and the state's primary theory.

67.    HARVEL, COLLINS, MYLES, and RICE's deliberate and knowing failure to disclose the above-referenced evidence to the prosecutor resulted in material exculpatory and impeachment evidence not being turned over to Plaintiff's defense counsel, in violation of the State's *Brady* obligations.

68.    HARVEL, COLLINS, MYLES, and RICE's *Brady* violations resulted in Plaintiff not receiving a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, (1995). Had HARVEL, COLLINS, MYLES, and RICE disclosed the *Brady* evidence, there

15

would have been no arrest, much less a conviction, as it would have completely tainted the entire investigation, including the alleged "confessions" by Plaintiff and McMullen. A re-trial that included the *Brady* evidence would result in a voluntary dismissal, directed verdict, or acquittal.

69.     The *Brady* evidence cited above would have been apparent to any reasonable officer acting in good faith.

70.     BERNARD HOWARD'S right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before July 16, 1994. *See Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established.").

## COUNT II

### *"BRADY"* VIOLATIONS BY DEFENDANT CHILDS

71.     Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

72.     At all times, Plaintiff had a constitutional right of due process, guaranteed by the 14th Amendments, to be free from police officers not disclosing to the prosecutor material exculpatory and/or impeachment evidence.

73.      Defendant, CHILDS, knowingly violated her unwavering legal duty

16

(*"Brady"* duty) to disclose to the prosecutors all material evidence where its

exculpatory and impeachment value was apparent, by failing to tell the prosecutor

the following:

> a.  That she had manufactured Plaintiff's false confession by
>     false promises, including that he could go home with his
>     mother if he signed the pre-typed statement.  This
>     undisclosed fact would have been exculpatory evidence
>     and impeached Childs' and the state's primary theory.

74.    CHILDS' deliberate and knowing failure to disclose the above-

referenced evidence to the prosecutor resulted in material exculpatory and

impeachment evidence not being turned over to Plaintiff's defense counsel, in

violation of the State's *Brady* obligations.

75.    CHILDS' *Brady* violations resulted in Plaintiff not receiving a fair

trial, described as "a trial resulting in a verdict worthy of confidence."  *Kyles v.

Whitley*, 514 U.S. 419, 434, (1995).  Had CHILDS disclosed the *Brady* evidence,

there would have been no arrest, much less a conviction.  CHILDS' disclosure of

her false confession tactics would have also tainted the "confession" made by

Kenneth McMullen to Officer Stephen Myles.  A re-trial that included the *Brady*

evidence would result in a voluntary dismissal, directed verdict, or acquittal.

76.    The *Brady* evidence cited above would have been apparent to any

reasonable officer acting in good faith.

77.    BERNARD HOWARD'S right to be provided with material

exculpatory and impeachment evidence ("*Brady*" evidence), was clearly

established before July 16, 1994.  *See Moldowan v. City of Warren*, 578 F.3d. 351,

382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990,

the earliest possible date for Detective Ingles' involvement in the case, that this

right was clearly established.")

<u>COUNT III</u>

<u>FEDERAL MALICIOUS PROSECUTION BY ALL DEFENDANTS</u>

78.     Plaintiff incorporates by reference each preceding paragraph as if

fully stated herein.

79.     At all times, Plaintiff had a constitutional right, guaranteed by the 4th

and 14th Amendments, to be free of illegal seizure and continued detention without

probable cause, based on fabricated evidence, false statements, and/or material

omissions which were knowingly or recklessly made, in order to manufacture

probable cause for an arrest and conviction.

80.     Defendant, HARVEL, as OIC, was under a constitutional duty to

make truthful statements to the prosecutor and magistrate judge to establish

probable cause for an arrest warrant.

81.     Defendant, HARVEL, as OIC, was under a constitutional duty to

refrain from creating and using fabricated evidence, namely the alleged

"confessions" made by McMullen and Salisbury to jailhouse snitch, Joe Twilley, to

manufacture probable cause for an arrest and continued detention.

82.     Defendant, CHILDS, as a homicide detective, was under a constitutional duty to make truthful statements to the prosecutor and magistrate judge to establish probable cause for Plaintiff's arrest and continued detention.

83.     Defendant, CHILDS, as a homicide detective, was under a constitutional duty to refrain from creating and using fabricated evidence, namely Plaintiff's alleged "confession," to establish probable cause for Plaintiff's arrest and continued detention.

84.     Defendant, COLLINS, as a homicide detective, was under a constitutional duty to refrain from creating and using fabricated evidence, namely the alleged "confessions" made by McMullen and Salisbury to jailhouse snitch, Joe Twilley, to manufacture probable cause for an arrest and continued detention.

85.     Defendant, MYLES, was under a constitutional duty to make truthful statements to the prosecutor and magistrate judge to establish probable cause for an arrest warrant.

86.     Defendant, MYLES, was under a constitutional duty to refrain from using fabricated evidence, namely the alleged "confession" made by McMullen to manufacture probable cause for an arrest and continued detention.

87.     Defendant, MYLES, also acting as OIC, was under a constitutional duty to refrain from using fabricated evidence, namely the alleged "confessions"

made by McMullen and Salisbury to jailhouse snitch, Joe Twilley, to manufacture probable cause for an arrest and continued detention.

88.    Defendant, RICE, as Supervisor over the individual defendants, was under a constitutional duty to refrain from authorizing the use of fabricated evidence, namely the procurement of alleged "confessions" made by McMullen and Salisbury to jailhouse snitch, Joe Twilley, to manufacture probable cause for an arrest and continued detention.

89.    Defendant, HARVEL, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false information and fabricated evidence, and omitted material information which showed a reckless disregard for the truth in requesting an arrest warrant, and swearing to facts in support of probable cause, which was material to a finding of probable cause.

90.    HARVEL's fabricated evidence, false statements and material omissions included:

    a.    Not telling the prosecutor or judge that Joe Twilley and Oliver Cowan were acting as "listening posts," or agents, for homicide detectives, to fabricate confessions or incriminating statements, as with McMullen and Salisbury;

    b.    Not telling the prosecutor or judge that the DPD Homicide Section had used jailhouse informants (snitch witnesses) as agents and listening posts for years to help secure convictions;

c. Not telling any prosecutor or judge that the McMullen and Salisbury "confessions" were fabricated by Joe Twilley;

d. Not telling any prosecutor or judge that Plaintiff's alleged "confession" was manufactured by Monica Childs;

e. Affirmatively indicating that Plaintiff had signed a written confession when he knew it had been fabricated by CHILDS; and

e. Other false statements or omissions of material facts that were knowingly or recklessly made, that will be discovered during the course of this lawsuit.

91. MYLES' fabricated evidence, false statements and material omissions

included:

a. Not telling the prosecutor or judge that Joe Twilley and Oliver Cowan were acting as "listening posts," or agents, for homicide detectives, to fabricate confessions or incriminating statements, as with McMullen and Salisbury;

b. Not telling the prosecutor or judge that the DPD Homicide Section had used jailhouse informants (snitch witnesses) as agents and listening posts for years to help secure convictions;

c. Not telling any prosecutor or judge that the McMullen and Salisbury "confessions" were fabricated by Joe Twilley;

d. Not telling any prosecutor or judge that Plaintiff's alleged "confession" was manufactured by Monica Childs;

e. Using jailhouse snitches, such as Joe Twilley and Oliver Cowan, as "listening posts" and agents for the DPD Homicide Section; and

f. Other false statements or omissions of material facts that were knowingly or recklessly made, that will be

21

discovered during the course of this lawsuit.

92.    Defendant, CHILDS, influenced or participated in the initiation of criminal prosecution when she deliberately and knowingly supplied false information and fabricated evidence, and omitted material information which showed a reckless disregard for the truth in swearing to facts in support of probable cause in the Preliminary Exam, which was material to a finding of probable cause.

93.    CHILDS' fabricated evidence, false statements and material omissions included:

    a.    That she manufactured Plaintiff's false confession, as outlined above, and chose not to tell the prosecutor or judge that it was fabricated;

94.    Defendant, COLLINS, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false information and fabricated evidence, which was material to a finding of probable cause.

95.    COLLINS' fabricated evidence included:

    a.    That he knew Joe Twilley was acting as a "listening post," or agent, for homicide detectives, to fabricate confessions or incriminating statements, as with McMullen and Salisbury.

96.    Defendant, RICE, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly authorized the use of false information and fabricated evidence, which was material to a finding of

probable cause.

97.    RICE's fabricated evidence included:

a.    That he knew Joe Twilley was acting as a "listening post," or agent, for homicide detectives, to fabricate confessions or incriminating statements, as with McMullen and Salisbury; and

b.    That he knew Oliver Cowan was also acting as a listening post and agent for the DPD and had fabricated a "confession" from Kenneth McMullen.

98.    BERNARD HOWARD'S right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges, guaranteed by the 4th and 14th Amendments, was clearly established before July 16, 1994.  *See Gregory v. Louisville,* 444 F.3d 725, 744 n. 8 (6th Cir. 2006) (knowing fabrication of evidence to manufacture probable cause violates constitutional rights at least as early as 1992); *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) ("[A]n officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.").

## COUNT IV

## FABRICATION OF EVIDENCE BY DEFENDANT CHILDS

99.    Plaintiff incorporates by reference each preceding paragraph as if

fully stated herein.

100.   At all times, Plaintiff had constitutional rights guaranteed by the 4th and 14th Amendments, to be free from police officers fabricating evidence to aid in a conviction.

101.   Defendant, CHILDS, violated Plaintiff's constitutional rights described above by the following misconduct:

> a.   Fabricating Plaintiff's false confession, as described above; and,
>
> b.   Using coercion, in the form of illusory promises and false evidence of Plaintiff's involvement.

102.   BERNARD HOWARD'S right to be free from the use of fabricated evidence to aid in a conviction was clearly established long before July 16, 1994. *See Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) ("[t]he reasoning in *Spurlock* is sound, and we follow it in holding that Stoiker was on notice in 1975 that it was unlawful for him to fabricate evidence") (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999)).

103.   BERNARD HOWARD'S due process right to be free from the use of a coerced, false confession to aid in a conviction was clearly established long before July 16, 1994.  *See Miller v. Fenton*, 474 U.S. 104, 109; 106 S.Ct.445; 88 L.Ed.2d 405 (1985) ("[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a

civilized system of justice that they must be condemned under the Due Process

Clause of the Fourteenth Amendment.").

## COUNT V

### VIOLATION OF 5TH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION BY DEFENDANT CHILDS

104.    Plaintiff incorporates by reference each preceding paragraph as if

fully stated herein.

105.    At all times, Plaintiff had a constitutional right, guaranteed by

the 5th Amendment, to be free from self-incrimination.

106.    Defendant, CHILDS, violated Plaintiff's constitutional rights

described above by the following misconduct:

      a.    Fabricating Plaintiff's false confession, as described above; and,

      b.    Using coercion, in the form of illusory promises and false evidence of Plaintiff's involvement.

107.    BERNARD HOWARD'S 5th Amendment right not to be a witness

against himself by use of a fabricated and coerced confession was clearly

established long before July 16, 1994.  *See United States v. Miranda*, 384 U.S. 436,

448; 86 S.Ct. 1602 (1966) ("As we have stated before, this Court has recognized

that coercion can be mental as well as physical, and that the blood of the accused is

not the only hallmark of an unconstitutional inquisition.") (internal citations and

quotations omitted).

## COUNT VI

## FABRICATION OF EVIDENCE BY
## DEFENDANTS HARVEL, COLLINS, MYLES, AND RICE

108.   Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

109.   At all times, Plaintiff had constitutional rights, guaranteed by the 4th and 14th Amendments, to be free of illegal seizure, continued detention, and violation of due process, based on intentionally fabricated evidence used to cause an arrest or conviction.

110.   Defendants, HARVEL, COLLINS, MYLES, and RICE, violated Plaintiff's constitutional rights described above by the following misconduct:

> a.   Using jailhouse trustee, Joe Twilley, as a listening post and agent for homicide detectives to fabricate confessions or incriminating statements, as with McMullen and Salisbury; and
>
> b.   Manufacturing a false confession from Kenneth McMullen by use of false evidence, threats, and illusory promises.

111.   BERNARD HOWARD'S right not to be deprived of liberty and due process based upon fabrication of evidence by police detective, was clearly established before July 16, 1994.  *See Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) ("[t]he reasoning in *Spurlock* is sound, and we follow it in holding that Stoiker was on notice in 1975 that it was unlawful for him to fabricate

26

evidence") (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999)).

## COUNT VII
## STATE LAW MALICIOUS PROSECUTION BY DEFENDANTS COLLINS, RICE, CHILDS, HARVEL AND MYLES

112.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

113.    The underlying criminal proceedings against Plaintiff ultimately terminated in his favor with a dismissal of the charges in state court on December 17, 2020.

114.    The criminal investigation and prosecution were undertaken without probable cause or good faith and with malice.  They were not undertaken with the intention of bringing Plaintiff to justice for having committed the alleged murder. Instead, the individual Defendants acted to frame Plaintiff for the triple homicide because the homicide detectives were under pressure to solve a high-profile triple slaying.  The individual defendants knew that absent the fabricated evidence, including the use of a serial snitch witness by COLLINS, RICE, and HARVEL, and false confessions in the case procured by CHILDS and MYLES, there was no evidence against Plaintiff to support probable cause for arrest or continued detention.

115.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff was charged and convicted of crimes he did not commit,

causing him to suffer the special injuries and damages set forth above.

WHEREFORE, Plaintiff, BERNARD HOWARD, prays the following:

- Compensatory damages in the amount of Fifty-Two Million Dollars ($52,000,000) or that which the fact-finder determines will fully, fairly, and reasonably compensate him for the harm he suffered;

- Punitive damages pursuant to 42 U.S.C. §1983 in the amount of Fifteen Million Dollars ($15,000,000) as to each individual Defendant;

- All damages as are available pursuant to MCL 600.2907 and the common-law of the State of Michigan;

- Pre-judgment interests, costs and statutory attorney fees, and other such relief as the Court deems appropriate.

*s/Wolfgang Mueller*
MUELLER LAW FIRM
Attorney for Plaintiff
41850 W. Eleven Mile, Suite 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated:  November 4, 2025

## **JURY DEMAND**

Plaintiff, by and through his attorneys, MUELLER LAW FIRM, demands a jury trial in this matter.

*s/Wolfgang Mueller*
MUELLER LAW FIRM
Attorney for Plaintiff
41850 W. Eleven Mile, Suite 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated:  November 4, 2025